IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br><br><br> vs. <br><br><br> JAIME ARTURO SOLARTE, et al., <br><br> Defendants. | MEMORANDUM DECISION AND ORDER SUBSEQUENT TO *JAMES* HEARING <br><br><br><br><br> Case No. 2:05-CR-785  TS |

This matter comes before the Court subsequent to a *James* Hearing, held on August 18, 2006, and September 28, 2006, to address the admissibility, under Fed. R. Evid. 801(d)(2)(E), of alleged co-conspirator statements made in connection with a money laundering and illegal structuring scheme.

## I.  BACKGROUND

The hearing on the above-mentioned dates addressed, respectively, what the Government refers to as the later conspiracy, and historical conspiracy in this action.  The historical

conspiracy relates to Counts 1 and 3 if the Indictment,[1] while the later conspiracy relates to Count 2 of the Indictment.[2]

At the August 18, 2006 portion of the hearing, the Government introduced Exhibits 1-24. Exhibit 1 is a letter—purportedly from Defendant Arturo Solarte to Defendant Jamie Solarte, providing bank account numbers and instructions concerning quantities of money orders that should be deposited into the bank accounts. Exhibits 2-21 are investigation reports written by an undercover officer ("U/C") which summarize statements between Defendants—mainly Defendant Jaime Solarte—and the U/C. Some of the reports incorporate by reference recordings of the conversations. Exhibits 22-24 are statements of bank account activity by Defendants.

Special Agent Bryan testified for the Government at the August portion of the hearing, and Special Agent Hatcher testified at the September portion of the hearing.

The Government, with respect to the later conspiracy, now seeks a ruling that Exhibits 2 through 21 are admissible as co-conspirator statements. Also, and in connection with the

---

[1]Count 1 alleges a conspiracy between Defendants Jaime Arturo Solarte, Andres Becerra, Marlene Dominguez, Antonio Rincon-Uban, German Mauricio Solarte, Jennifer Cristina Arismendi-Ordaz, Bertha Arteaga, Segundo Caicedo, Alvaro Arteaga Pabon, Rosario Pabon, Felix Solarte, and Maria Helena Christensen, to launder drug proceeds in violation of § 102 of the Controlled Substances Act ("CSA"), and to defraud a foreign bank in violation of 18 U.S.C. § 1956(a)(2)(A). Count 3 alleges a conspiracy between the same Defendants to illegally structure bank transactions to avoid reporting requirements, in violation of 31 U.S.C. § 5324(a)(3).

At base, it is alleged by the Government that various Defendants: first, used individual bank accounts to accept drug proceeds; second, moved the proceeds between several accounts so as to simultaneously disguise their origin and avoid federal reporting requirements; and third, facilitated the withdrawal of the laundered money.

[2]Count 2 of the Indictment alleges that Defendants Jaime Solarte, Juan Gilberto Lopez, and Ana Cecilia Toscano conspired to launder drug proceeds in violation of of § 102 of the CSA, and 18 U.S.C. §§ 2, 1956(h).

historical conspiracy, the Government asks that the Court find Exhibit 1 admissible as a co-conspirator statement.

## II.  DISCUSSION

*A.  Standard*

Under Fed. R. Evid. 801(d)(2)(E), statements by co-conspirators are properly admissible as non-hearsay at trial if "[t]he court determine[s] that (1) by a preponderance of the evidence, a conspiracy existed; (2) the declarant and the defendant were both members of the conspiracy; and (3) the statements were made in the course of and in furtherance of the conspiracy."[3]  It is the burden of the government in this case to prove each of the elements by a preponderance of the evidence and it is the trial court that determines admissibility.[4]  The Court may consider the co-conspirator statements themselves in assessing whether the predicate elements are met under Rule 801(d)(2)(E).[5]  The Tenth Circuit requires some independent evidence, other than co-conspirator statements, linking the defendant to the conspiracy.[6]  Such evidence may include direct observations and contacts with the defendant.[7]

First, "[t]o obtain a conviction for conspiracy, the government must prove that (1) there was an agreement to violate the law; (2) Defendant knew the essential objectives of the

---

[3]*United States v. Urena*, 27 F.3d 1487, 1490 (10th Cir. 1994).

[4]*Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987); *United States v. Owens*, 70 F.3d 1118, 1123 (10th Cir. 1995).

[5]*Bourjaily*, 483 U.S. at 178.

[6]*Owens*, 70 F.3d at 1124-25.

[7]*See, e.g.*, *United States v. Hernandez*, 829 F.2d 988, 993 (10th Cir. 1987).

conspiracy; (3) Defendant knowingly and voluntarily took part in the conspiracy; and (4) the co

[-]conspirators were interdependant."[8]  "To prove an agreement, the government need not offer

direct proof of an express agreement on the part of the defendant.  Instead the agreement may be

informal and may be inferred entirely from circumstantial evidence."[9]  However, "[i]t is not

enough . . . for the government to show only mere association with conspirators [or] casual

transactions between the defendant and conspirators."[10]

To demonstrate knowledge of essential objectives, "the government must prove that the

alleged conspirator had a general awareness of both the scope and the objective of the

enterprise."[11]  However, a "conspirator need not know of the existence or identity of the other

members of the conspiracy or the full extent of the conspiracy."[12]  Also, while a defendant is

considered a knowing participant in a conspiracy when he or she acts in furtherance of the

objective of the conspiracy,[13] the Tenth Circuit has contextualized this rule using a "common

---

[8]*E.g.*, *United States v. Pulido-Jacobo*, 377 F.3d 1124, 1129 (10th Cir. 2004).

[9]*Id.* at 1129-31.

[10]*United States v. Evans*, 970 F.2d 663, 669 (10th Cir. 1992) (internal quotation and citation omitted).

[11]*Id.* at 670.

[12]*Id.* at 669.

[13]*Pulido-Jacobo*, 377 F.3d at 1131.

sense" approach.[14]  Finally, "[i]nterdependence exists where each co[-]conspirator's actions constitute essential and integral steps toward the realization of a common, illicit goal."[15]

Second, and somewhat repetitive of the above-mentioned conspiracy elements, to qualify as a member of a conspiracy, each member must have knowledge of the agreement to accomplish an illegal goal and intend to associate themselves in some way with the conspiracy.[16]

Third, a statement is made during the course of a conspiracy if it is made before the objectives of the conspiracy have either failed or been achieved.[17]  Moreover, a statement need not further the attainment of an agreement; it is enough that it further an object of the agreement.[18]

B.  *Exhibits 2 through 21 (The Later Conspiracy)*

The Government generally argues that it has, by a preponderance of the evidence, established that a conspiracy existed; that the declarants and the defendants were members of the conspiracy; and that the statements at issue were made in the course of, and in furtherance of, the conspiracy.  Notably, only Defendant Toscano opposes the Government as to the admissibility of Exhibits 2 through 21.

---

[14]*Evans*, 970 F.2d at 669 (internal quotation and citation omitted) (stating that the suggestion that a drug dealer who knows his supply can be traced to the Medillin cartel has joined a vast distribution conspiracy with the members of the cartel defies common sense).

[15]*Pulido-Jacobo*, 377 F.3d at 1131.

[16]*See, e.g., United States v. Ivy*, 83 F.3d 1266, 1286 (10th Cir. 1996).

[17]*United States v. Perez*, 989 F.2d 1574, 1579 (10th Cir. 1993).

[18]*United States v. Magleby*, 420 F.3d 1136, 1145 (10th Cir. 2005).

The Government argues that Defendants Jaime Solarte, Toscano, and Gilberto Lopez entered into an agreement, the objectives of which were to launder money provided by Defendant Jaime Solarte and represented to be the proceeds of drug distribution.  The Government attempts to establish this alleged conspiracy by citing to several events, evidenced both by the actual statements of the alleged conspirators and by the investigative reports of the U/C.

First, apparently relying on the testimony of the Special Agent, the Government argues that Defendant Toscano, a manager at a Zions Bank branch, opened a Zions Bank bank account for Defendant Jaime Solarte, after his previous accounts, at the same location, had been frozen or closed due to suspected laundering activity.  The Government also asserts that this newly-opened bank account was used to receive money from the U/C, which was subsequently laundered through Defendant Lopez's church.

Second, the Government relies on Exhibit 2.  Exhibit 2 relates to a March 3, 2005 meeting between the U/C and Defendant Jaime Solarte, where the former told the latter that he had drug proceeds that needed to be "cleaned up."  In Exhibit 2, Defendant Jaime Solarte:

- states that he has been engaged in previous money laundering operations; and

- discusses how to process the money, including using his already existing accounts, as well as setting up new Zions Bank bank accounts with false social security numbers.

Third, the Government relies on Exhibit 3.  Exhibit 3 relates to a March 6, 2005 meeting between the U/C and Defendant Jaime Solarte.  In Exhibit 3, Defendant Jaime Solarte:

- discusses transactions involving $15,000 that the U/C had given Solarte to launder;

- states that a pastor, Defendant Juan Gilberto Lopez, could assist with future transactions;

- states that a female named Ana, who worked for Zions Bank[19] had given him pointers and ideas on what to do with his money so as not to be detected; and

- responds to the U/C's inquiry regarding whether he could assist in setting up a Zions Bank Account using false information by stating that he would confer with Ana.

Finally, the Government relies on Exhibits 4-21.  The Government summarizes the events within these exhibits, namely, meetings between the U/C and Defendants, and asserts that, during the period covered by the exhibits, and as evidenced by their contents, Defendant Toscano discussed with Defendant Solarte the opening of false accounts with false identification and social security numbers, and later assisted the U/C in opening such an account.

Defendant Toscano first counters that she did not agree to commit an illegal act.  She implies that there was nothing improper with re-opening an account for Solarte, and asserts that there is no evidence that Solarte was not entitled to open other accounts.  Defendant Toscano argues that she had nothing to do with the deposits into, or withdrawals from, the account.  She also argues that merely setting up an account for the U/C using false names and social security numbers, where only a minimal deposit of one hundred dollars was initially made, is not sufficient to establish an agreement to launder money.

Second, Defendant Toscano argues that she did not have knowledge of the essential objectives of the conspiracy, and that she did not knowingly and voluntarily become part of that conspiracy.  More specifically, Defendant Toscano argues that she did not know that Defendant

---

[19]Purportedly Defendant Toscano.

Solarte would use a newly opened account for money laundering.  Defendant Toscano refers to

Exhibit 18—where Defendant Solarte states that Defendant Toscano knows where the U/C's

"money comes from," and from which the U/C understood that she "[knew] the money to be

placed into the account was drug money"—and asserts that the U/C's commentary was not a

reasonable inference, but rather, mere speculation.   Moreover, Defendant Toscano asserts that

this is inconsistent with a prior statement by Defendant Solarte that the U/C should never

mention the source of the money to Defendant Toscano.

Third, Defendant Toscano argues that there was no interdependence between the alleged

conspirators.  More specifically, Defendant Toscano asserts that Defendant Solarte had a Key

Bank bank account to launder money, and characterizes her actions as a familial favor, rather

than an attempt to further a money laundering objective of Defendant Jaime Solarte.

The Court finds that, by a preponderance of the evidence, the Government has established

the existence of a conspiracy among the Count 2 Defendants.  First, the Court finds the

Government has demonstrated an informal agreement to launder money by the alleged

conspirators, which agreement may be inferred from the circumstantial evidence in the proffered

exhibits, and by the testimony of Special Agent Bryan.  It is undisputed that Defendant Jaime

Solarte's actions with respect to the U/C's money were illegal.  The circumstantial evidence set

forth by the Government also shows that Defendant Toscano had a general awareness of both the

scope and the objective of Defendant Jaime Solarte's illegal activities, and knowingly and

voluntarily agreed to provide a degree of assistance in helping him to accomplish them.  Whether

Defendant Toscano was motivated by a familial relationship in doing so is irrelevant.

Defendant Toscano clearly acted in furtherance of the objective of the conspiracy by opening the various accounts in question. Defendant Toscano does not dispute that she knew that Defendant Solarte's accounts had been previously closed due to suspected illegal laundering activity. Moreover, she does not attempt to address Defendant Jaime Solarte's statements to the U/C that she allegedly initially offered ideas and assistance, and then later, the fact that she actually provided assistance, to help Defendant Jaime Solarte and the U/C avoid detection.

Having determined the existence of the conspiracy, the Court also finds that the Government has shown that the declarant and the Defendants were members of the conspiracy, and that the statements at issue were made in the course of, and in furtherance of, the conspiracy. Accordingly, the Court determines that Exhibits 2 through 21 are admissible as against all three Count 2 Defendants under Rule 801(d)(2)(E).

### C. Exhibit 1 (The Historical Conspiracy)

Here also the Government generally argues that it has, by a preponderance of the evidence, established that a conspiracy existed; that the declarants and the Defendants were members of the conspiracy; and that the statements at issue were made in the course of and in furtherance of the conspiracy. Specifically, the Government argues that it has established that each of the Count 1 and 3 Defendants was laundering money and engaging in illegal bank account structuring by bringing U.S. dollars illegally from Colombia through the United States, then converting them back into Colombian pesos through ATM withdrawals in Colombia, a practice known as black market peso exchange. Only Defendants Dominguez, Arismendi, and Rincon-Uban oppose the admission of Exhibit 1.

9

The Government uses Exhibits 1, 22-25,[20] and the hearing testimony of Special Agent Hatcher, to set forth evidence of money laundering and structuring activity.  More specifically, the Government sets forth the following evidence in support of an illegal conspiracy:

The Government points to Exhibits 2 and 18 in which Defendant Jaime Solarte alludes to his involvement in past money laundering from Colombia which, the Government alleges, was comprised of elements similar to the alleged laundering and structuring in this case.  The Government asserts that in Paragraph 16 of Exhibit 18, Defendant Jaime Solarte stated that members of his family would assist in his alleged laundering schemes.  Also, Special Agent Hatcher testified that 90% of U.S. dollars coming out of Colombia comes from the illegal drug trade.

The Government asserts that, with three exceptions, discussed in more detail below, each Count 1 and 3 Defendant is related to Defendant Jaime Solarte, opened in person, and held one of the bank accounts allegedly used to launder and structure money.  The Goverment sets forth Exhibit 25 as a summary of the inter-account activity of the Defendants.  Using Exhibits 22-24, the Government asserts that there was no local activity out of the bank accounts in question for any legitimate purposes.  The Government also provides a summary of deposits made into the accounts that, if combined, would exceed the amounts which would require reporting.

The Government concedes that three Defendants—Arismendi, Dominquez, and Rincon-Uban—were not named as holders of any of the bank accounts in question.  However, the

---

[20]Exhibit 25, introduced at the September portion of the hearing, contains a diagram summarizing the bank activity from Exhibits 22-24.

Government contends that each of these three Defendants assisted in making deposits into the accounts, and purchased money orders for that purpose.   The Government contends that the actual deposits into the above-mentioned accounts were made through money orders purchased either by Defendant Jaime Solarte, Dominguez, or Arismendi.

Finally, the Government points to Exhibit 1, a March 31, 2003 letter purportedly sent by fax, from Defendant Jaime Solarte's father, Defendant Felix Arturo Solarte, to Defendant Jaime Solarte, during the period of the account activity in question.  The letter allegedly directs Defendant Jaime Solarte where to deposit or transfer money, and identifies by number, several of the Defendants' bank accounts.

Defendant Rincon-Uban argues that there is insufficient evidence to establish that he was a part of any conspiracy.  More specifically, Defendant Rincon-Uban states that the sole evidence that the Government uses to implicate him are four Pan American Loan Processing Company payroll or loan closing checks given by him to Defendant Jaime Solarte.  Defendant Rincon-Uban also asserts that, on cross-examination, Special Agent Hatcher testified that Defendant Rincon-Uban was not a signatory on any bank account at issue, did not deposit any checks into these accounts, and did not receive any sum of money back.  Defendant Rincon-Uban emphasizes that Special Agent Hatcher admitted on cross-examination that the checks at issue could have been merely payroll checks.

Defendant Marlene Dominguez also argues that there is insufficient evidence to establish that she was a part of any conspiracy.  Defendant Dominguez concedes that she made deposits using money orders for Defendant Jaime Solarte.  She also states that Special Agent Hatch

testified that several money orders bear her name as purchaser.  However, Defendant Dominguez

argues that she never opened any of the bank accounts in question, and that the presence of her

name on the money orders does not demonstrate that she actually purchased them.  Furthermore,

Defendant Dominguez also asserts that she had no knowledge of the objectives of the conspiracy

because she made the deposits at issue as part of her employment duties for Defendant Jaime

Solarte's mortgage company.  Finally, Defendant Dominguez asserts that, because there is no

proof that she purchased any money orders, her actions were not interdependent with the

fulfillment of a shared criminal goal.

Defendant Arismendi-Ordaz also argues that there is insufficient evidence to establish

that she was a part of any conspiracy.  Specifically, she contends that the only evidence submitted

by the Government against her consists of money orders, allegedly purchased by her on May 22,

2003, and deposited into Defendant Jaime Solarte's savings account on September 4, 2003.

Defendant Arismendi-Ordaz argues that there is no evidence that she actually purchased the

money orders, or that she participated in the deposit.

Each of the above-mentioned Defendants correctly points out that there is no reference to

them found in Exhibit 1.

The Court finds that with respect to Defendants Rincon-Uban, Dominguez, and

Arismendi-Ordaz, the Government has not shown by a preponderance of the evidence that these

individuals were part of the alleged agreement, that they knew the essential objectives of the

conspiracy, or that they knowingly and voluntarily took part in it.  More specifically, the Court

notes that the Government has made no argument, and has set forth no facts, as to whether the

three above-mentioned Defendants had a general awareness of both the scope and objective of either the overall structuring or the money laundering enterprise, as alleged by the Government.

The Court notes as significant the fact that none of these three individuals were holders of the accounts allegedly used to launder or structure money. The Court also notes that, with respect to Defendants Rincon-Uban and Dominguez, there appear to be legitimate explanations for the activities which the Government alleges tie them into the larger conspiracy. Importantly, it has been established that Defendant Rincon-Uban did not even deposit any money into the bank accounts in question. Although the activity of Defendant Arismendi-Ordaz may be suspect, the Government has not shown that she was generally aware of the overall alleged conspiracy. To the extent that the Government attempts to establish a conspiracy merely by connecting these individuals to Defendant Jaime Solarte through work or other relationships, such association is not enough. While, if true, the actions of the above-mentioned defendants appeared to further the objective of the larger conspiracy, given the scarcity of evidence that the Government has set forth, the Government simply has not met its burden here.

With respect to the other Count 1 and 3 Defendants, the Court finds that the Government has shown, by a preponderance of the evidence, that a conspiracy existed, that the declarant and Defendants were all members of the conspiracy, and that the statements in Exhibit 1 were made in the course of, and in furtherance of, the conspiracy. More specifically, with regard to the alleged conspiracy, the Government has demonstrated an agreement between the other Count 1 and 3 Defendants to engage in money laundering and illegal structuring. The evidence supports that each of these Defendants opened up bank accounts and facilitated transfers and withdrawals

13

necessary to conduct the overall alleged illegal scheme.  The evidence also supports that the other

Count 1 and 3 Defendants knew the essential objectives of the conspiracy, and knowingly and

voluntarily took part in the conspiracy, as they either actively participated, or allowed their

accounts to be used in the manner described above.  Finally, the other Count 1 and 3 Defendants

were interdependent in that the money laundering and structuring scheme required the movement

of money between the various accounts.

Also, the Court finds that the Government has shown, by a preponderance of the

evidence, that each of the other Count 1 and 3 Defendants was a member of the conspiracy.  The

account activity among the Defendants, in addition to the foreign withdrawals, demonstrates their

knowledge of an agreement to accomplish an illegal goal and intent to associate themselves in

some way with the overall conspiracy.

Finally, the Court notes that the statements made in Exhibit 1 were made during the

course of the abovementioned conspiracy.

### III.  CONCLUSION

Based on the above, it is hereby

ORDERED that Exhibits 2 through 21 be ADMITTED as co-conspirator statements

against the Count 2 Defendants.  It is further

ORDERED that Exhibit 1 is INADMISSIBLE as a co-conspirator statement against

Defendants Rincon-Uban, Dominguez, and Arismendi-Ordaz.  Exhibit 1 is ADMISSIBLE

against the other Count 1 and 3 Defendants.

SO ORDERED.

14

DATED   January 30, 2007.

BY THE COURT:

_____

TED STEWART
United States District Judge